WIEGAND et al. v. W. BINGHAM CO. et al.

CUTLER–HAMMER, Inc., v. WIEGAND et al.

Nos. 7892, 7893.

Circuit Court of Appeals, Sixth Circuit.

Sept. 18, 1939.

Victor D. Borst, of New York City (Hull, Brock & West, of Cleveland, Ohio, Stockbridge & Borst and Victor D. Borst, all of New York City, and William E. Chilton, of Cleveland, Ohio, on the brief), for Wiegand et al., appellants and cross-appellees.

J. Bernhard Thiess, of Chicago, Ill. (Ames, Thiess, Olson & Mecklenburger, J. Bernhard Thiess, and George W. Hansen, all of Chicago, Ill., Bates, Golrick & Teare, of Cleveland, Ohio, and Frank H. Hubbard, of Milwaukee, Wis., on the brief), for Bingham and Cutler-Hammer, appellee, and cross-appellant.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

SIMONS, Circuit Judge.

The suit which led to the decree assailed by appeal and cross-appeal was for infringement of two patents granted to Wiegand for electrical heating elements, the first numbered 1,614,330, granted January 11, 1927, and the second, No. 1,614,938, granted January 18, 1927, upon a divisional application for a heating element of the strip type. The plaintiffs were the inventor and his exclusive licensee. The suit was brought against a jobber in Cleveland, Ohio, but the manufacturer of the alleged infringing heater intervened and counter-claimed for infringement of Lightfoot patent No. 1,699,898. The District Court held the first Wiegand patent (330) valid but not infringed, the second Wiegand patent (938) invalid because of lack of patentable distinction between it and the first, and the Lightfoot patent invalid.

Each of the patents admittedly relates to improvement in an old art, in the utilization of heat generated by the passing of electric current through resisting wire. While space heaters are involved, the patents relate primarily to structures designed for application to things to be heated and so requiring that the resistor be not bare but sheathed, and electrically insulated from the casing by an insulating medium that serves efficiently as a thermal conductor, affording minimum opposition to the transfer of heat from the resistor.

The essential parts of such heating elements are the resistor, the insulation, the casing, and terminals for feeding current to the resistor. The conventional insulation of the prior art was mica, which is low duty insulation dehydrating at approximately 830 degrees F. The introduction of Nichrome wire of nickel chromium iron alloy, patented by Marsh, No. 811,859, made possible the operation of metallic resistors without fusing at temperatures as high as 2,000 degrees F. The Marsh invention broadened the scope for electrical heating, but necessitated insulating material capable of higher duty than mica. The art turned to media such as magnesium oxid, quartz, soapstone or talc. Lightfoot in 1920, patent 1,359,400, and Abbott in 1921, patent 1,367,341, the latter sustained in Cutler-Hammer Mfg. Co. v. General Electric Co., 7 Cir., 6 F.2d 376, taught the use of granular magnesium oxid in tubular heating elements, the dry powdered insulation being funneled into the tubular casing after insertion of the resistor through an end temporarily left open for that purpose, and compacted about the resistor by swaging the tubular jacket after sealing so as to reduce its diameter. Braun, patent No. 1,324,582, 1919, taught the use of cement as insulation, and Wiegand achieved marked success in the manufacture of flatirons between 1912 and 1919 employing cementitious refractory insulation, being awarded a number of patents upon processes (1,136,076, 1915; 1,398,410, 1921).

Of Wiegand's fourteen claims in the 330 patent, validity and infringement of claims 1 to 12 were in issue. Since entry of the decree below claims 1, 3, 5, 8, 9 and 12 were held invalid by the District Court of the Eastern District of Pennsylvania in the case of Edwin L. Wiegand Co. et al. v. Howell E. Trent Co., 39 U.S., P.Q., 158. As a consequence of this holding Wiegand amended claims 1, 3, 5 and 12 by disclaimer. It is now contended by the appellants on the one hand that the amended claims never having been adjudicated are out of the case on appeal, and by appellees on the other that the amended claims are not pat-

entably distinguishable from claims not disclaimed and so all are void under the holding in Maytag Co. v. Hurley Machine Co., 59 S.Ct. 857, 83 L.Ed. 1264, decided May 22, 1939. In view of our conclusion upon the issue of infringement, we see no necessity of passing upon either contention, for conceding validity to all claims in suit as originally granted or as subsequently amended, they are not infringed.

Each of the claims includes as an element in the patented combination "granular refractory electrical insulating material." It is the contention of the appellees that the claims must be read as drawn to an insulating material which is plastic in course of heater manufacture and becomes hardened cement in the finished product, and that only if the term "granular" is considered as referring to cementitious material can the claims be found to comprehend anything that is new. The master concluded that the patent upon its face required construction of the term "granular" since the specification refers to the insulating medium variously as "a hard and compact mass of cement-like refractory material," "the refractory mass," "a compact mass of refractory material," and "the plastic refractory material." So concluding, he analyzed the history of the art, the file wrapper narrative, and the evidence, and found all pointing to a concept which included cementitious insulation and excluded the pourable, dry, non-cohering granular insulation employed by the defendant. Upon this construction alone could the claims be held valid over the prior art. With this the court below agreed.

■■ We are aware that in some jurisdictions reference to file wrapper history to ascertain the meaning of claims is looked upon with disfavor except insofar as it covers the question of estoppel through rejected claims. Spalding & Bros. v. Wanamaker, 2 Cir., 256 F. 530. This is on the ground that it involves looking at preliminary negotiations in the interpretation of a formal document intended to be the final memorial of the parties' intentions. We have not so tightly closed the door to inquiry upon the precise concept of the inventor measured by his own representations. Scaife & Sons v. Falls City Woolen Mills, 6 Cir., 209 F. 210; Tee Pee Rubber Co. v. I. T. S. Rubber Co., 6 Cir., 268 F. 250; Firestone Tire & Rubber Co. v. United States Rubber Co., 6 Cir., 79 F.2d 948; Wood v. Peerless Motor Car Corp., 6 Cir., 75 F.2d 554; Cf. Bishop & Babcock Mfg. Co. v. Western Auto Supply Co., 6 Cir., 105 F.2d 886, decided June 28, 1939. We have noted expanding judicial view in construing private contracts so as best to effectuate the clear intention of the parties. Fifth-Third Union Trust Co. v. Cist, 6 Cir., 105 F.2d 282, decided June 28, 1939, for as said by Professor Williston, 3 Contracts, 1780, "The question the court is seeking to answer is the meaning of the writing at the time and place where the contract was made." Conceding that extrinsic aid to construction must be accepted with caution, yet where in the difficult art of claim draftmanship terms employed in effort to avoid prior art are susceptible of construction transcending the clear limits of the inventive concept, there should be no more reluctance to search for precise meaning than in a private contract.

Wiegand experienced more than the usual difficulty in satisfying the examiner that his application disclosed novelty having the quality of invention. In his original claims the term "granular" nowhere appears. Wiegand at first thought it enough to recite that his insulating material was receptive and refractory, and sought to convince the examiner that this distinguished it from mica. It was not enough. The material was then characterized as cement-like, and the specification altered to read (as it still does) "the resistor is molded in and completely enveloped by a hard and compact mass of cement-like refractory material." It was urged in argument that "nothing in the prior art would have taught applicant to embed within the highly compacted mass of cement-like refractory material a sinuous ribbon resistor which is actually molded into the mass and is supported throughout its entire length by the material." The new claims were rejected on Hadaway No. 1,007,441, in view of Hadaway No. 1,094,-851, and Lightfoot No. 947,247, and 1,445,-897, since Hadaway disclosed a resistant element embedded in asbestos saturated with japan and baked under pressure, and Lightfoot showed a resistant element embedded in cement. The claims were again cancelled and sixteen new claims submitted on March 2, 1926, in which the expression "granular refractory insulating material" first appears, and language was added to the specification to indicate that the pro-

duction of sheathed embedded electrical heating elements by providing a comparatively shallow open sided receptacle into which the granular refractory insulating material and the resistor might be properly placed before the receptacle is closed distinguished the invention from and showed marked advantages over the tubular type of element. This emphasis on the sheathing of and the embedding of the resistor in the insulating material clearly proclaims a concept of insulation plastic during the embedding process and compacted into a hardened mass when the sheathing is completed. One may not conceive of dry, comminuted, non-cementitious sand or powdered substance being so manipulated or so described.

When we return to the patent it is equally clear that Wiegand's thought was confined to an insulation plastic when manipulation was required and cement-like in dried and completed form. Drawings and specification depict and describe one form of sheathing with perforations. It is, of course, clear that a dry granular material must escape from a perforated casing and serve no purpose, and while this form is suggested in instances where it is unnecessary to provide a tight seal for the insulating material, yet the patent is entirely silent as to the possibility of a resistor being "molded" into insulation which is not plastic, or as to how with such insulation "the refractory mass will be forced into the perforations and serve to bind the refractory material and casing together." While the inventor did not limit himself to a particular kind of refractory insulating material, he found especially suitable for his purpose an insulation composed of magnesium or aluminum oxid or zirconium silicate individually or in compound, together when desirable with a binding material such as clay "to give the necessary plasticity during fabrication and to effect homogeneity in the final product." So while the insulation of the patent is undoubtedly granular, as is the insulation of the accused heaters, the patent as its own lexicon clearly assigns to this element a cement-like though granular characterization. Moreover, each of the claims describes a resistor with terminals accessible through an opening in the sheath. This clearly conveys the thought of terminals anchored in a hardened mass, and repels the thought of terminals floating in dry, non-cementitious material or fixed to the casing.

When we turn to the evidence the implications are equally clear. Wiegand testified that before perfecting his product patent he had to overcome a difficulty due to lack of a suitable process, and to devise a new one, which he called the "sieving" process, described in his patent 1,398,410, issued November 29, 1921. That disclosure is one for the preparation of an embedding material plastic, receptive and impressionable. Neither Wiegand's corresponding British patent nor his Canadian patent No. 256,524, contains any reference to the insulating material as granular, and both were issued before the word "granular" was incorporated in the specification and claims of the 330 patent. The Wiegand Company, so far as the evidence discloses, employed in its commercial practices only cement-like insulation. There is no indication that Wiegand ever made a heater such as described in the patent with dry, non-cohering insulating material, and indeed it is clear from the patent office argument that neither he nor his solicitor thought it could be done commercially on account of having to introduce the resistor and the insulation through the end of the casing. We agree that the claims in suit must be construed as limited to the combination of the resistor, sheathing and cementitious insulation, and that so construed the defendants do not infringe.

The second Wiegand patent, 938, is directed to a specific form of the generic invention known as a strip heater. It is in form long, thin and narrow, and may be either straight or bent as need requires. It is a combination of a resistor, an elongated narrow metal sheath made up of a plurality of parts, and an artificially compacted mass of granular refractory insulating material filling the space between the resistor and sheath, the resistor being provided with terminals accessible through openings in the sheath.

Heaters in strip form were not new. The defendant manufactured them in great numbers with mica insulation. Its presently assailed device is not substantially to be distinguished in appearance from its old strip heaters, and its insulation is dry, non-cementitious granular refractory material funneled into the sheath at an end left open for that purpose as in the tubular heaters specifically disclaimed by Wiegand. It is then compacted under pressure imposed upon the casing with result identi-

cal to the effect of swaging the tubular heater sheath.

If invention is to be found in Wiegand's 938 patent it is in the combination of the strip sheath and cementitious granular insulation, plastic in process and cement-like when dried. The master had grave doubt as to the validity of the patent, the court perceived no patentable distinction between it and Wiegand's generic invention, and denied it validity. We find it unnecessary to determine the issue, for it is clear for reasons developed in respect to the first patent that the specific form claimed in 1,164,938 is not infringed by the defendant.

The Lightfoot patent of the counterclaim is concerned with a variation in the sheath. While the defendant makes no broad claims for it, it asserts it to be a patentable improvement over Abbott 1,494,-939. The Abbott device is a tubular heater held between a pair of welded plates which extend beyond the recess in which the heater is secured, heat being transferred from the inner metal casing to the outer. In Lightfoot the vanes are integral with a single metal casing separated from the resistor by the insulation. Lightfoot carried forward the Abbott idea of increased radiation surface but it is doubtful that this step denoted more than mechanical skill. In any event direct contact between insulation and an external sheath carrying vanes is not patentably to be distinguished from the disclosure of the British patent to Barman, No. 416 (1899). Both master and court held Lightfoot to be invalid, and we agree.

The decree below is affirmed.